750 So.2d 366 (1999)
STATE of Louisiana
v.
Mark A. JENKINS.
No. 98-KA-1603.
Court of Appeal of Louisiana, Fourth Circuit.
December 29, 1999.
*368 Harry F. Connick, District Attorney, Orleans Parish, John Jerry Glas, Cate L. Bartholomew, Asst. Dist. Attys., New Orleans, Counsel for Plaintiff/Appellee.
Paula Corley Marx, Louisiana Appellate Project, Lafayette, Counsel for Defendant.
Court composed of Chief Judge ROBERT J. KLEES, Judge JOAN BERNARD ARMSTRONG and Judge MICHAEL E. KIRBY.
ARMSTRONG, Judge.

STATEMENT OF CASE
On October 17, 1996, the defendant, Mark A. Jenkins, was indicted for the first degree murder of Rivet Hedderel. The bill of information alleged that the murder occurred during the perpetration or attempted perpetration of an armed robbery. The defendant entered a plea of not guilty at his arraignment on October 21, 1996. The trial court denied the defendant's motion to suppress identification on January 24, 1997. On January 15, 1998, after a three day jury trial, the defendant was found guilty as charged. The penalty phase was conducted on January 16, 1998. The jury recommended life imprisonment at hard labor. The defendant filed a motion for new trial on January 30, 1998. At the hearing on February 13, 1998, the trial court denied the defendant's motion for new trial, motion for post verdict judgment of acquittal and motion for reconsideration of sentence. The defendant waived delays, and the trial court sentenced the defendant to serve life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.
The defendant's counsel assigned three errors for our consideration. In addition, the defendant, in a pro se brief, assigned two errors.

STATEMENT OF FACTS
Ms. Pat O'Brien was a close personal friend of Rivet Hedderel. Mr. Hedderel rented the residence at 1438 North Derbigny Street from Ms. O'Brien. Ms. O'Brien last saw the victim on the evening of August 18, 1996. She attempted to call Mr. Hedderel on the morning of August 19, 1996 but the phone line was busy. Later in the morning, Ms. O'Brien received a call from Leon Courtney who informed her that there was blood on the steps of the residence on North Derbigny. She then went to the residence. When she arrived, she saw the blood on the steps. The front doors were closed. As she walked into the house, she saw the victim's leg and the phone cord. She screamed and ran out. She went next door and called the police. Ms. O'Brien acknowledged that the victim was homosexual and owned a red Buick.
Officer Byron Winbush of the New Orleans Police Department Crime Lab processed the crime scene. The front door of the residence was open when he arrived. There was blood on the front steps and bloody footprints in the living room. In the next room, the bedroom, the victim *369 was lying on the bed on his back with the telephone in his hand. The room after the bedroom was the kitchen. There was evidence of a struggle in the kitchen which included broken glass, a knife and bloody footprints. Blood was also found in the bathroom. Officer Winbush took photographs of the scene and collected evidence, including fifteen blood samples from various places in the residence. The officer also collected six hair samples: four from the kitchen floor, one from the bedroom floor and one from the front door. Other items collected included a partially smoked cigarette and ashtray, a blood stained towel found in the bathroom, two broken glasses and two bottles of whiskey from the kitchen, and the phone from the bedroom. A six inch knife and a twelve inch butcher knife were recovered from the kitchen. The six inch knife was bent. The officer also collected a pair of men's white underwear, a pair of men's black jeans and a blanket from the bedroom. The bathroom rug, which had bloody footprints on it, was collected as evidence. The office took photographs of the bloody footprints found on the rug. A newspaper circular with blood on it was found on the front steps of the residence.
Officer Winbush also photographed the victim at the autopsy. He was also responsible for processing the victim's vehicle. The vehicle was photographed. The officer found a blood stained jacket in the car. There were also blood stains on the steering wheel and steering column of the car. Blood was found on the exterior driver's side door. Eyeglasses, a checkbook and a wallet were also found in the vehicle.
Officer Timothy Seuzeneu processed the crime scene for fingerprints. During the processing of the scene, the officer found a bloody handprint on the bathroom door, a bloody fingerprint on the exterior of the front French doors, two partial bloody fingerprints on the exterior of the front French doors, two foot impressions in blood on the kitchen floor, and one bloody handprint on the exterior of the wooden bathroom door. Other objects recovered at the scene which the officer processed for fingerprints included a black handled eight inch knife, one white ceramic ashtray, one beige rotary dial telephone, one butcher block with four knives, three drinking glasses, one partially full bottle of Maker's Mark Bourbon, one partially full bottle of Kettle One Vodka, and one black handled five inch kitchen knife. One partial fingerprint was found on the five inch knife. The officer also processed the victim's vehicle for fingerprints and found ten partial fingerprints.
The officer returned to the residence to process the floors for all possible foot impressions. The officer found three partial foot impressions in the front room, two partial foot impressions in the bedroom, six partial foot impressions in the bathroom and one partial foot impression in the bathroom. The officer then compared the impressions with the victim's socks and the defendant's socks. The impressions were found to match the victim's socks.
Officer Seuzeneu also attempted to lift fingerprints from "The Club", a steering wheel lock, a Whitney Bank VISA card, two Wal-Mart receipts, two VISA sales slips, a newspaper, and a xerox copy of a newspaper article. The officer was unable to find any fingerprints on the steering wheel lock, the VISA card and the Wal-Mart receipts. However, he was also to locate a partial fingerprint on the other items.
Dr. Michael DiFatta conducted an autopsy on the victim. Dr. DiFatta testified that the victim had multiple incised and stab wounds. The victim had four stab wounds and ten incised wounds. The stab wounds were deeper but not as wide as the incised wounds. The victim suffered stab wounds to his abdomen, left back shoulder, and back of his head. The victim incurred incised wounds to the back and face. The victim also had multiple contusions to the face. There were multiple fractures of the nasal bone. The fractures radiated into the sinus area and included a long midline *370 fracture of the hard palate. The fractures could have been caused by a blunt object or by the victim's head being slammed down on a hard surface, such as a kitchen or bathroom sink. Dr. DiFatta testified that after the victim sustained the fractures of the face he would not have been able to scream with the amount of blood in his airways. The victim drowned in his blood. The physician noted the victim had three superficial incised wounds to the distal joints of three fingers of his right hand. This injury could be considered a defensive wound.
The parties stipulated that tests of the victim's blood revealed an alcohol level of.14 and the presence of diphenhydramine, a common antihistamine found in over the counter cold medications. The parties also stipulated that oral and rectal swabs and smears taken from the victim were negative for seminal fluid or spermatozoa. The victim had Type B blood.
On August 19, 1996, Alma St. Amant and Mary Ann Lugenbuhl were working at Leon Borja's Jewelers when the defendant walked in the store. Ms. Lugenbuhl went to assist the defendant who stated he was interested in purchasing a bridal set. Ms. Lugenbuhl noticed that the defendant's hand was bandaged. Ms. St. Amant then went to assist Ms. Lugenbuhl with the sale as Ms. Lugenbuhl had just started working at the store. The defendant was also interested in placing a ring in layaway. About fifteen minutes later, a young woman, whom the defendant identified as his sister, came into the store and spoke with the defendant. The defendant attempted to pay for the jewelry with a credit card. After the defendant signed the sales slip, Ms. Amant noticed a discrepancy between the signature on the sales slip and the signature on the credit card. She asked the defendant to spell his name. The defendant could not correctly spell the last name on the credit card. The name on the credit card was Rivet Hedderel. Ms. St. Amant identified the sales receipt and layaway card at trial. Both Ms. Lugenbuhl and Ms. St. Amant identified the defendant in a photographic lineup as the person who signed the sales slip and layaway card.
Conchetta Pecoraro and Kellie Kimball worked at Natalie's Dress Shop on August 19, 1996. Natalie's Dress Shop is located next to Borja's Jewelers in St. Bernard Parish. On that day, the defendant and a young woman came into the store. The young woman purchased a dress. Ms. Pecoraro and Ms. Kimball identified the defendant in a photographic lineup as the person who was with in the young woman when the dress was purchased.
Rose Bianchini was working at the Wal-Mart in Chalmette, Louisiana, on August 19, 1996. While she was working in the jewelry department, the defendant approached her seeking to purchase a watch for his father. The defendant bought a watch and diamond earrings. The defendant used a credit card with the name of Rivet Hedderel on it to purchase the items. Ms. Bianchini identified the Wal-Mart receipt and watch at trial. She also identified the defendant in a photographic lineup as the person who purchased the jewelry items with the credit card.
Officer Ed Delery of the New Orleans Police Department Crime Lab processed the receipts from Borja's Jewelers, a receipt from K-Mart, and a handwritten letter for fingerprints. The officer found twenty-five fingerprints on the letter, four partial fingerprints on the K-Mart receipt, and one fingerprint on the Borja layaway ticket.
Officer Glen Burmaster of the Latent Fingerprint Unit, attempted to identify the fingerprints found at the scene and on the victim's vehicle. One of the fingerprints found on the exterior side of the front French doors to the victim's residence was identified as the defendant's left index finger. Sixteen fingerprints taken from the vehicle were not identifiable. Numerous fingerprints taken from inside the residence were not suitable for identification. *371 Seven fingerprints found on the handwritten letter belonged to the defendant.
Ms. Karen Lewis-Holmes, a civilian criminalist with the New Orleans Police Department, examined sixty pieces of evidence in an attempt to type the blood found on the items. The blood found on the victim's clothing was Type B. The blood found on the defendant's clothing was found to be human blood but could not be typed. Hair samples found in the victim's undershirt were found to be similar to the victim's hair. The black coat found in the vehicle had human blood on it but the blood was unable to be typed. White shorts and black jeans found on the scene also had human blood on them but the witness was not able to type the blood. The left shoe of the defendant's Nike tennis shoes had Type B blood on it. The blood on the right shoe could not be typed. The bathroom rug found on the scene had Type B blood on it. The two knives, the telephone and a drinking glass also had Type B blood on them. A twenty dollar bill confiscated from the defendant was found to have Type B blood on it. Blood samples taken from the kitchen sink, kitchen faucet, kitchen pantry, refrigerator and bedroom floor were identified as Type B blood. Blood samples taken from the exterior handle of the bedroom dresser drawer, the front step and vehicle's exterior driver's side door were identified as Type O blood. Ms. Holmes testified that the victim had Type B blood and the defendant had Type O blood.
Detective Mark Jackson of the St. Bernard Sheriffs Office assisted Detective Ronquillo with the recovery of the victim's vehicle on August 20, 1996. Detective Jackson met with Donna Jenkins and Donald Patrick and assisted with the execution of the search warrant at 3217 Golden Drive, Apartment C.
Sgt. Robert McNab of the St. Bernard Sheriff's Office was informed by Detective Hoobler of the New Orleans Police Department that a homicide had occurred in New Orleans and the victim's credit cards had been stolen and used in St. Bernard. After learning that the victim was homosexual and obtaining a brief description of the suspect, the officer compiled a photographic lineup of subjects known in the area who preyed on homosexuals. The defendant was not included in this lineup. On August 20, 1996, Sgt. McNab responded to a call in the thirty-three hundred block of Golden Drive where the victim's vehicle had been found. Sgt. McNab contacted Detective Ronquillo. The area was canvassed and photographs were taken of the vehicle. Sgt. McNab also spoke with Donna Jenkins and Donald Patrick. He was present for the statements given by Ms. Jenkins and Mr. Patrick to Detective Ronquillo. The officer also obtained a search warrant for 3217 Golden Drive, apartment C. Sgt. McNab participated in the execution of the search warrant. The defendant's blood stained clothing, including socks, underwear, a Girbaud tee shirt and jeans, were recovered from the apartment. The officers also found blood stained bandages. The items recovered during the execution of the search warrant were turned over to Detective Ronquillo.
Sgt. Al Clavin, a detective with the St. Bernard Sheriffs Office, participated in the investigation of the victim's vehicle. The officer learned that evidence from the case may have been pawed at L & M Pawn Shop. The officer identified the pawn shop receipt which revealed that the defendant pawned a television.
Donna Jenkins, the defendant's sister, was living on Golden Drive in August of 1996 with her boyfriend, Donald Patrick, and their newly born daughter. The defendant was living with them at the time of the incident. The defendant came home at approximately 3:00 a.m. on August 19, 1996. He had blood all over him. The defendant told her that he had been in the French Quarter with his friends Sunshine and Coco when he got jumped by a group of men. Ms. Jenkins told the defendant to shower and she would care for his hand. While the defendant was cleaning up, Ms. *372 Jenkins went to Wal-Mart and purchased some bandages. When she returned home, she bandaged the defendant's hand. She put defendant's clothes in the laundry room. After Ms. Jenkins bandaged defendant's hand, the defendant told Ms. Jenkins that he had to return his friend's father's vehicle. The defendant left and returned a few hours later. Immediately after the defendant had arrived home, Ms. Jenkins' boyfriend moved the vehicle across the street. The vehicle, a red Pontiac, had a Mississippi license plate. There was a jacket inside the car. Ms. Jenkins told the defendant he should call the police and report the assault. The defendant did not want to call the police. When the defendant returned, they all went to sleep. The next day, Ms. Jenkins, her boyfriend and the defendant went shopping. They went to K-Mart where they bought baby items and a stereo. The defendant told Ms. Jenkins that the credit card belonged to his friend's father. The name on the card was Rivet Hedderel. After K-Mart, they went to Wal-Mart. Ms. Jenkins then took her boyfriend to work. Mr. Patrick worked for Whitney Bank in New Orleans. When she returned home, she and the defendant went shopping. They went to Natalie's Dress Shop where she bought a dress. While she was at Natalie's, the defendant went to Borja's Jewelers. After Ms. Jenkins purchased the dress, she met the defendant at the jewelry store. The defendant was looking for an engagement ring for his girlfriend. Ms. Jenkins left the store and returned to Natalie's. When the defendant left the jewelry store, they went to visit their sister, Bessie Heninger. Later that evening, Ms. Jenkins picked up her boyfriend from work.
On August 20, 1996, Ms. Jenkins' boyfriend, Donald Patrick, noticed that the red Pontiac was parked down the street from their residence. Mr. Patrick asked the defendant questions. Ms. Jenkins then went outside and saw the vehicle. She noticed several police officers around the vehicle. At that time, Ms. Jenkins's sister, Bessie, and her boyfriend, Kelly Patrick, arrived. Bessie told Ms. Jenkins that she believed the defendant killed someone. Ms. Jenkins started crying and confronted the defendant. The defendant told her that another person killed the guy. He told her that he "just robbed" the victim. Ms. Jenkins told the defendant to leave. Later the evening, Ms. Jenkins and Mr. Patrick met with police officers and gave them statements.
Donald Patrick testified that he dropped the defendant off in the French Quarter at approximately 3:00 p.m. on August 18, 1996, on his way to work. When Mr. Patrick returned home from work around 10:00 p.m., the defendant was not at home. The defendant got home around 1:00 a.m. He had blood all over him. The defendant was wearing a white shirt, white shorts and Nike tennis shoes. The defendant's hand was cut. Donna bandaged the wound. The defendant told him that three to four black guys attacked him. A little while later, Donald went outside and saw the Pontiac. He moved the vehicle across the street. He saw a jacket and a wallet in the car. The defendant said that the car belonged to the father of his friend, Coco. The defendant left to return the vehicle. The next day, Donna, Donald and the defendant went shopping. They went to K-Mart where the defendant bought a stereo and to Wal-Mart where they bought baby items. The defendant used a credit card which, according to the defendant, belonged to his friend's father. They also went to a Chevron station. Donna then drove Donald to work. The following day, the witness noticed a red Pontiac parked down the street. Donald called Donna outside and showed her the car. At that time, Donna's sister, Bessie, and his brother, Kelly, came to their apartment. Bessie told them that the person's whose name was on the credit card was dead. Donna confronted the defendant and told him to leave. The defendant took his stereo and clothes and left. Donna and Donald *373 then went to the Sheriffs Office. They gave statements to Detective Ronquillo.
Detective John Ronquillo was the lead investigator on the homicide case. He arrived on the crime scene in the morning and stayed on the scene until approximately 3:00 p.m. When he learned that the victim's credit cards had been used in St. Bernard, he contacted the St. Bernard Sheriffs Office to ascertain the location of the stores where the credit card had been used. The officer then went to the stores to obtain a description of the suspect. He later obtained the name of a suspect when Ms. Jenkins and Mr. Patrick went to the St. Bernard Sheriffs Office. The officer obtained statements from Ms. Jenkins and Mr. Patrick. Detective Ronquillo participated in the execution of the search warrant of 3217 Golden Drive, apartment C. Once the officer obtained the suspect's name, he compiled a photographic lineup which he presented to the sales clerks at the stores where the credit card was used. The sales clerks identified the defendant in the photographic lineup. Detective Ronquillo then prepared an arrest warrant for the defendant. The officer received information that the defendant was living in Harvey, Louisiana. Detective Ronquillo contacted the Jefferson Parish Sheriffs Office and obtained its assistance in defendant's arrest. The defendant was arrested on August 22, 1996. Detective Ronquillo first encountered the defendant at the Jefferson Parish Sheriffs Office Detective Bureau. The officer transported the defendant to Charity Hospital for treatment of injuries received while the defendant was at the Detective Bureau. After the defendant received treatment for his cuts, Detective Ronquillo took the defendant to the homicide office. The officer advised the defendant of his rights, and the defendant gave a statement.
The defendant contended in his statement that he was defending himself against the victim. According to the defendant, the victim approached the defendant in the French Quarter and offered the defendant one hundred dollars to "talk to him." The defendant and the victim left the French Quarter in the victim's vehicle and went to the victim's house. When they arrived there, the victim offered the defendant more money if they could "cuddle." Thereafter, the two men undressed and lay down on the victim's bed. While they were talking, the victim took out a small knife. He told the defendant not to get upset and he would not hurt the defendant. He told the defendant he "got off" on tracing defendant's nipples with the knife. The victim then asked the defendant if he would engage in sexual relations with him, and the defendant refused. The defendant jumped up from the bed and went into the kitchen. The victim followed. The defendant took the knife out of the victim's hand and stabbed him. When the knife broke, the defendant picked up another knife and continued to stab the victim. The defendant stated that the victim threatened him with the knife and defendant's actions were in self-defense. The defendant tried to leave the house but the doors were locked. He took the victim's coat because it had the house keys in it. However, defendant could not unlock the doors so he kicked them open. He then took the victim's car so he could get home. When he left, the victim was alive. The victim was standing outside the house yelling at him.
Detective Ronquillo testified that in spite of defendant's statement that he had to kick open the front doors, there was no evidence of a forced entrance or exit at the victim's house. Detective Ronquillo testified that he recovered the victim's credit card from Wal-Mart. The officer also stated that a witness who lived near the victim informed him that she heard moaning at approximately 12:15 a.m. on August 19, 1996.
Detective Greg Thurman of the Jefferson Parish Sheriffs Office participated in the defendant's arrest. The defendant was arrested at a residence on Morriswood Drive in Marrerro, Louisiana. Upon arrival *374 at the residence, Detective Thurman stationed himself at the back of the house to insure that no one left the house. When the officer learned that the defendant had been taken into custody, he entered the house. The defendant was wrapped in a towel, walking from the laundry room to a bedroom. Two uniformed police officers had the defendant in custody. After Detective Thurman advised the defendant of his rights, the defendant said "What, the faggot ratted on me?" Later, while the defendant was getting dressed, the defendant told the owner of the house "Regardless of what you hear, I didn't intend to hurt the man. He was trying to hurt me." The defendant also said, "He ratted on me." The defendant also stated that he would be "sentenced to jail for the rest of his life or would die as a result of this." A consent to search was obtained from the owner of the house. The officers recovered several items which belonged to the defendant, including a suitcase, shoes which had blood on them, a toothbrush, toothpaste, clothing and a letter to the defendant's sister. These items were released to Detective Ronquillo. After the defendant's arrest, the defendant was transported to Jefferson Parish Sheriffs Office Detective Bureau. The defendant was placed in an interview room. The room had a table, a few chairs, a suspended ceiling and a viewing window. The defendant attempted to escape and fell through the ceiling. The officers then shackled the defendant to the desk.
Stewart James, an expert in forensic science and blood stain pattern interpretation, testified on the defendant's behalf. He reviewed photographs of the crime scene to analyze the blood stain patterns found on the scene. Upon reviewing a photograph of the victim on his bed, Mr. James stated that there were two types of blood stains on the bed: transfer pattern stains and exhaled blood. The exhaled blood stains were little clots of blood that the victim breathed out at the end. Such blood stains indicated that the victim was alive for a period of time during the bloodshed. Other photographs of the bedroom showed evidence of tracking of blood on the carpet. The blood stain patterns indicated the blood was dripping down the legs of the victim. The blood stain patterns in the bedroom were not representative of any assault on the victim in the bedroom. The uppermost dresser drawer had a blood transfer stain on it. A transfer stain is a blood stain that comes from when someone has blood on their hands or their body and their hands or body comes into contact with an object and the blood is transferred to the object. The photograph of the drawer indicated that the drawer was open and there was a transfer blood stain on a piece of material inside the drawer.
The photographs of the kitchen revealed that there were blood splatters in the kitchen sink. There was a large transfer blood stain on the kitchen cabinets. The blood was transferred to the cabinet and ran down the cabinet. The photographs also showed transfer blood stains on the refrigerator. Hair samples in the area of the refrigerator suggested that the victim's head came into contact with the refrigerator. The circular blood stains on the floor would have been caused by the rapid expulsion of blood from a bleeding person who was not on the floor. The swiping marks on the floor are called alterations. Such marks are made by fingers running through the blood. Such marks are seen when someone is either on their hands and knees or when someone is groping the floor. The knife on the floor indicated that the kitchen was the central area of activity. The bloody footprints on the floor were made by someone wearing socks.
The hand print found on the bathroom door was a transfer print. Other photographs of the bathroom indicated that the bleeding person was standing close to the sink and came into contact with those areas. The blood stains on the floor indicated a significant amount of dripping blood. *375 There was no evidence of violent activity in the bathroom.
The photographs of the front steps and doors revealed the existence of transfer blood stains on the front doors. The blood stains on the door sill and steps were caused by the dripping of blood. The blood on the steps is consistent with someone standing there bleeding for a measurable period of time, i.e. several seconds.
Mr. Stewart also examined the defendant's clothing. The blood stains on the defendant's socks indicated that the defendant stepped in blood. There were also impact spatter marks on the outside surface of the socks, which was consistent with forceful impact, e.g. confrontational activities. The person was not wearing shoes while the beating or struggle took place. The defendant's underwear and undershirt also had the same type of impact spatter marks. The defendant's undershirt also had transfer blood stains. The defendant's shorts and shirt had transfer blood stains on them. There were no impact spatter marks which indicated that the shorts and shirt were not exposed during any forceful events.
On rebuttal, Officer Glen Burmaster testified that he was able to identify one of the two fingerprints found on the front French door as belonging to the defendant.
On the morning of August 19, 1996, Leon Courtney, the victim's neighbor, was walking his dog when he observed a lot of blood on the front steps and door of the victim's house. The shutters were semi-closed. Mr. Courtney went home and called Ms. O'Brien. When Ms. O'Brien arrived, she went inside the house. She was shaken and said "Oh, my God, I think something has happened." She walked to the end of the front room and yelled to him to call 911. They both ran out of the house and called the police. Ms. O'Brien was upset and crying.

ERRORS PATENT
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER 1
In his first assignment of error, the defendant contends that the State failed to produce sufficient evidence to prove that the incident occurred during an armed robbery and that the defendant did not act in self-defense.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The defendant was indicted for the first degree murder of Rivet Hedderel while in the perpetration or attempted perpetration of an armed robbery. The defendant claims that the State failed to produce evidence that an armed robbery occurred. The defendant argues that if a theft occurred, *376 it occurred after the altercation in which the victim incurred fatal injuries. La. R.S. 14:64 defines armed robbery as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."
The testimony introduced at trial clearly supports the allegation that the murder occurred during the perpetration of an armed robbery. The defendant admitted in his statement that he stabbed the victim numerous times. The defendant told his sister, Donna Jenkins, that he robbed the victim. When the defendant left the victim's house, he took the victim's car, wallet and credit card. Further, the defendant used the victim's credit card the day after the murder. Ms. St. Amant and Ms. Lugenbuhl identified the defendant as the person who attempted to use the victim's credit card at Borja's Jewelers. Ms. Pecorora and Ms. Kimball testified that the defendant allowed his sister to use the credit card at Natalie's Dress Shop. Ms. Bianchini identified the defendant as the person who used the credit card to purchase jewelry at Wal-Mart. The defendant's sister, Donna Jenkins, and her boyfriend, Donald Patrick, were with the defendant when he used the victim's credit card. The defendant's actions in taking the victim's car, wallet and credit card after the attack on the victim were part of a continuous chain of events. The defendant's argument is without merit.
The defendant also suggests that the State failed to prove that the defendant did not act in self-defense. La. R.S. 14:20 provides, in pertinent part, that a homicide is justified when "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. McClain, 95-2546 (La.App. 4th Cir.12/11/96), 685 So.2d 590. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary under the circumstances to save the defendant from that danger. State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ denied 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id. However, a defendant who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that the defendant desires to withdraw and discontinue the conflict. La. R.S. 14:21.
The defendant argues that the victim attempted to force the defendant into having sexual relations with him. In his statement, the defendant stated that the defendant approached him with a knife. However, the defendant disarmed the victim and then used the knife on the victim. The defendant did not stab the victim once. The defendant admitted that when the small knife bent, he found a larger knife and continued to stab the victim. Further, according to Dr. DiFatta, the victim suffered fourteen stab and incised wounds and numerous lacerations and contusions. Dr. DiFatta described the numerous knife wounds as "overkill." In addition, the victim suffered severe fractures to the face. Those injuries were probably caused by the victim's face being slammed into a large blunt object. Dr. DiFatta stated that the victim was possibly incapacitated at that point.
*377 Such testimony was sufficient for jury to conclude that the defendant did not act in self-defense. Even if the jury accepted the defendant's statement that the victim approached him with a knife, the defendant admitted that he disarmed the victim. At that point, the defendant could have left. Instead, the defendant used the knife to inflict injuries to the victim. When that knife broke, the defendant found a larger knife and continued his assault on the victim.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 2 AND PRO SE ASSIGNMENT OF ERROR NUMBER TWO
The defendant also argues that he was denied his right to exculpatory evidence when the identity of a witness was not revealed to him until the day of trial. In his pro se assignment, the defendant contends his Sixth and Fourteenth Amendment rights were violated when the State withheld critical exculpatory evidence which would have supported the defendant's theory of self-defense and would have given the trial a different outcome.
The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Brady rule is based on due process of law. "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383. The test for determining materiality is the same whether or not the defense makes a pretrial request for exculpatory evidence. Id.
The defendant claims that the State failed to provide exculpatory evidence to him prior to trial. The alleged exculpatory evidence concerns information given to Detective Ronquillo by a woman who lived near the victim. The witness informed the officer that she heard moaning at approximately 12:15 a.m. on August 19, 1996. Without ruling the evidence to be exculpatory, the trial court requested the State to provide the defendant with the witness's name, address and telephone. The State provided the information to the defendant and informed the trial court that it had requested an instanter subpoena on the witness. Neither party called the witness to testify at trial.
While the defendant alleges the witness' statement was exculpatory, he produces no evidence to support his allegation. He simply argues that the witness' statement would have supported his version of the events. He suggests that the witness' statement that she heard moaning is consistent with his statement that the victim was standing outside yelling at him when he left. However, the defendant is incorrect. The witness' testimony only indicates that someone was in pain.
Further, the State provided the defendant with the witness' name, address and phone number. The State also informed the defendant that the witness had been subpoenaed to appear at trial. However, the defendant did not call the witness to *378 testify on his behalf, and there is nothing in the record to suggest that the witness did not appear.
The defendant has not met his burden of proving that the evidence was exculpatory and/or shown, by a reasonable probability, that the outcome of trial would have been different had the witness testified.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3
The defendant further asserts that the trial court erred in failing to grant the defendant's motion to excise portions of the defendant's taped confession that included racial slurs which were prejudicial and amounted to character evidence against the defendant.
Prior to trial, the defendant sought to excise a portion of his statement made during his taped confession to the police. The defendant told the officers that when he arrived home after the incident, he told his sister that he had been "jumped by a bunch of niggers." The defendant used the term "niggers" one other time during the confession. The trial court denied the defendant's request, stating:
I think the statement has the right to come in as he made the statement. I don't think I should get myself into a posture now of trying to excise things toforbecause some words may be more harsh than others. Obviously in statements where people use curse words, sometimes curse words offend jurors. We don't take out those four letter words. We let the jurors hear those things.
The only time that we excise statements is if defendants admit to other criminal activity that has no bearing on the particular case. That's the rule of law. That has always been the rule of law. Where he talks about committing other crimes, other murders, other robberies, other thefts, et cetera, the jury should not hear that because that prejudices the jury with regard to the person's character. But this is a statement. There is a statementthe State is alleging in their opening statementI gather from their theory of the casethat this man is a(sic) armed robber, killer. That's their theory. And that at the time of his apprehension and prior to that, he made statements exculpating himself, contradictory statements to different peoplefamily members, friends and law enforcement. It's their theory that he tells these different stories to throw blame or responsibility in every direction but in his own direction, according to the State's theory.
La. R.S. 15:450 states that "[e]very confession, admission or declaration sought to be used against any one must be used in its entirety, so that the person to be affected thereby may have the benefit of any exculpation or explanation that the whole statement may afford." A recorded confession is considered the best evidence of what a defendant has said. See State v. Alexander, 328 So.2d 144 (La.1976). A confession must be used in its entirety. State v. Loyd, 455 So.2d 687 (La.App. 2nd Cir.1976), writ denied, 461 So.2d 313 (La. 1984); State v. Overton, 596 So.2d 1344 (La.App.1stCir.1992), writ denied, 599 So.2d 315 (La.1992). In State v. Loyd, the defendant sought to excise profane language used in his confession. The appellate court affirmed the trial court's denial of the defendant's request, stating
[a]ny confession, of course, is prejudicial but that prejudice is outweighed by its probative effect. A defendant should not be able to "clean up" his confession or complain of added prejudice because he voluntarily interjects profanity into his confession if the confession is otherwise admissible under the law and the constitution.
Loyd, 455 So.2d at 688.
In the present case, the trial court was within its discretion when it denied the defendant's request to excise the use of the word "niggers" from the defendant's *379 confession. The trial court recognized that the word is offensive and could offend members of the jury. However, a portion of a defendant's confession should not be excised because words used by the defendant may offend a juror's sensibilities.
This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 4
The defendant argues that the trial court erred in that when the instruction on justification was repeated at the jury's request, the portion of the instruction concerning self-defense against homosexual rape was not read. The defendant suggests that the failure to include this portion of the jury charge created an impression to the jury that it was less important or did not apply to the case.
La.C.Cr.P. article 802 requires the trial court to charge the jury as to the law applicable to the case. The trial court is required to charge the jury, when properly requested, as to the law applicable to any theory of defense which the jurors reasonably could infer from the evidence. State v. Johnson, 438 So.2d 1091 (La.1983). The refusal to give a requested special charge does not warrant reversal of a defendant's conviction unless it prejudices substantial rights of the accused. La. C.Cr.P. article. 921; State v. Marse, 365 So.2d 1319 (La.1978); State v. Johnson, 514 So.2d 684 (La.App. 2d Cir.1987).
During the jury charge, the trial court instructed the jury on the theory of justifiable homicide:
Under special instructions, I will read to you what is called "justifiable homicide." If you find that the defendant killed the alleged victim in this case and that he was justified in doing so, this is what we call in our law a "justifiable homicide," and it would be your responsibility to return a verdict of not guilty.
I will explain what is meant by a justifiable homicide. A homicide is justifiable when committed for the purpose of preventing a violent or forcible felony involving danger to life or great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary to prevent the violent or forcible felony. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life if he attempted to prevent the felony without the killing.
Again, a justifiable homicide. A homicide is justifiable when committed for the purpose of preventing a violent or forcible felony involving danger to life or great bodily harm by one who reasonably believedone who reasonably believes that such an offense is about to be committed and that such action is necessary to prevent the violent or forcible felony. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life if he attempted to prevent the felony without the killing.
Thus, if you find, One, that the defendant killed for the purpose of preventing the commission of a violent or forcible felony involving danger to life or great bodily harm, and, Two, that the defendant reasonably believed that such a felony was about to be committed, and Three, that the defendant reasonably believed that the killing was necessary to prevent such a felony from being committed, and Four, that the defendant reasonably believed that there would be serious danger to his own life if he attempted to prevent the felony without the killing, then you must find the defendant not guilty. That is the law of justifiable homicide.
I talked in terms  when I explain the definition of justifiable homicide, I use the term "a violent or forcible felony." Under our law, I will tell you that in Louisiana, a rape is considered an act of violence and it is considered a forcible felony. The definition of rape in Louisiana is as follows: Rape is defined as the act of anal sexual intercourse with a male person committed without that *380 person's lawful consent. That is our definition of rape in Louisiana as it relates to a homosexual act. Rape is defined as the act of anal sexual intercourse with a male person committed without that person's lawful consent.
Justifiable homicide is a form of self-defense. If the jury finds that the defendant has raised the claim of self-defense, that is, he acted in self-defense, the defendant does not have the burden of proof on that issue but rather the State must prove beyond a reasonable doubt that the killing in this case was not committed in self-defense.
Two hours after the jurors left to deliberate, they sought additional instructions from the trial court on the law of first degree murder, second degree murder, manslaughter and justifiable homicide. The trial court instructed the jurors on these issues of law. The trial court provided further instruction on the theory of justifiable homicide:
Justifiable homicide. As we talked, a justifiable homicide, when it is done for the prevention of a violent or forcible felony. A homicide is justifiable when it is committed for the purpose of preventing a violent or forcible felony involving danger to life or great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary to prevent the violent or forcible felony. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life if he attempted to prevent the felony without the killing.
The law goes on to state, Thus, if you, the jury find, One, that the defendant killed for the purpose of preventing the commission of a violent or forcible felony involving danger to life or great bodily harm and Two, that the defendant reasonably believed that such a felony was about to be committed, and Three, that the defendant reasonably believed that the killing was necessary to prevent such a felony from being committed, and Four, that the defendant reasonably believed that there was serious danger to his own life if he attempted to prevent the felony without killing, then your verdict must be not guilty.
Now, is there any questions or any elaboration on any of those things? I'll try to go over it again if anyone isif it's not clear or anyone is confused. Any questions? And anyone can speak. (No resonse (sic) from the jury).
The defendant contends that the trial court should have instructed the jury on the definition of rape as a forcible and violent felony when the jury requested additional instruction on the theory of justifiable homicide. However, the jury did not request such an instruction. The jury sought instruction on the law applicable to first degree murder, second degree murder, manslaughter and justifiable homicide. The trial court provided the jury with the additional instructions and asked the jurors if they had any additional questions. None of the jurors indicated that additional instructions, other than those originally sought, were needed. As the trial court provided the jury with a lengthy and precise instruction during the initial jury charge on the definition of rape as a violent and forcible felony, the trial court did not err when it did not instruct the jury again on the issue when the jury sought clarification on the issues of first degree murder, second degree murder, manslaughter and justifiable homicide.
This assignment is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 1
In his first pro se assignment of error, the defendant contends that he received ineffective assistance of counsel. He claims that his trial counsel failed to request a continuance when the trial court granted his motion for exculpatory evidence on the first day of trial revealing statements of a witness which supported defendant's version of the incident.
*381 Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4th Cir.1990); State v. Reed, 483 So.2d 1278 (La.App. 4th Cir. 1986). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La. 1983); State v. Ratcliff, 416 So.2d 528 (La. 1982); State v. Garland, 482 So.2d 133 (La.App. 4th Cir.1986); State v. Landry, 499 So.2d 1320 (La.App. 4th Cir.1986).
The defendant's claim of ineffective assistance of counsel is to be assessed by the two part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). The defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defendant. Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Strickland, supra at 686, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra at 693, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4th Cir.1992).
This court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." State v. Bienemy, 483 So.2d 1105 (La.App. 4th Cir. 1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." State v. Brooks, 505 So.2d 714, 724 (La.1987), cert. denied, Brooks v. Louisiana, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
In the present case, the defendant contends that his trial counsel was ineffective for failing to file a motion for continuance after the State informed defendant of the name of the witness who told Officer Ronquillo that she heard moaning in the early morning hours of August 19, 1996. The defendant suggests that his trial counsel should have sought to continue the trial in order to meet with the witness and obtain her presence for trial. However, a review of the trial transcript indicates that the State had sought an instanter subpoena for the witness on the first day of trial. The defendant's trial counsel stated, on the second day of trial, that his investigator was attempting to meet with the witness and had also subpoenaed the witness for trial. Thus, as it appeared that the witness would be available for trial, the defendant would not have been entitled to a continuance. See La.C.Cr.P. article 709. Furthermore, a continuance cannot be granted once a trial has begun. La C.Cr.P. article 708. Thus, as the defendant would not have been entitled to a continuance, his trial counsel was not ineffective for failing to file a motion for continuance.
This assignment of error is without merit.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.