MICHAEL E. KIRBY, Judge.
 

 STATEMENT OF CASE
 

 The State of Louisiana indicted Roy Parker for the second degree murder of his wife, Veronica Parker, and for the attempted second degree murder of Brian Davis. Parker pled not guilty to both counts. Although he later amended his pleas to not guilty by reason of insanity, he again amended his pleas to not guilty. At the conclusion of a three-day trial, a twelve-person jury found him guilty as charged on both counts. The court denied Parker’s motions for new trial and for post verdict judgment of acquittal. Parker noted his readiness for sentencing, and the court sentenced him on the murder count to life imprisonment and on the attempted murder count to fifty years at hard labor. Each sentence is to be served without benefit of parole, probation, or suspension of sentence and each is to be served concurrently. The court denied Parker’s motion to reconsider sentence but granted his motion for appeal.
 

 FACTS
 

 Roy Parker shot and killed his wife, Veronica, and shot and wounded her coworker, Brian Davis, on the morning of May 2, 2009. At the time of the 12shooting, Ms. Parker and Mr. Davis were with several coworkers who had gathered after work for drinks at the Erin Rose Bar, near the hotel where they worked. Ms. Parker sustained nine gunshot wounds. She died of massive internal bleeding from perforations to her aorta, lungs, liver, diaphragm, spleen, and stomach. Mr. Davis sustained gunshot wounds to his stomach and his legs.
 

 Carol Francis, Ms. Parker’s mother, testified that at the time of the shooting, the defendant and her daughter were separated, and Ms. Parker was staying at Ms. Francis’ apartment.
 

 The State played tapes of 911 calls concerning three incidents involving Ms. Parker and the defendant. The first, on December 14, 2008, involved a domestic disturbance at a residence on Behrman Highway where the defendant was reported to be pounding on the door. The second was of a domestic battery call on April 28, 2009, a few days before the shootings, also at the Erin Rose and also involving the Parkers. The third tape was calls concerning the shootings.
 

 Off. Kori Keaton testified that she responded to the 911 call of December 14, 2008. When she arrived she noticed a broken window with glass pieces lying inside the apartment, showing an attempted entry. Ms. Parker told her that she was asleep in her mother’s apartment, and woke up when she heard her husband arguing with a neighbor outside. Ms. Parker heard a loud crash from the front of the apartment, got up to investigate and saw her husband standing inside the front room with his arm bleeding. Ms. Parker told her that the defendant ran into her
 
 *58
 
 bedroom and back out again, stating that he was just checking to see if she had a man in the bedroom, and then he left. The officer later got an arrest warrant for the defendant.
 

 | (.Concerning the April 28, 2009 incident, Kelsey Herman, one of Ms. Parker’s coworkers, testified that a group of employees from the hotel gathered at the Erin Rose to socialize after they got off work. Around 3:00 a.m. the defendant arrived as usual to pick up Ms. Parker. Ms. Parker told the defendant that she was getting ready to leave and would meet him outside. The defendant became mad, grabbed and threw a barstool, and dragged Ms. Parker out of the bar. Ms. Herman testified that after the defendant left, Ms. Parker came back inside the bar, locked herself in the bathroom, and cried. Another coworker, Jamie Burton, testified that he was also in the bar that night and that the defendant came into the bar and yelled at Ms. Parker. The defendant ripped Ms. Parker’s barstool from under her and dragged her out of the bar. Mr. Burton followed the pair outside, and when the defendant saw Mr. Burton, he released Ms. Parker, got in his car and drove away. Mr. Burton testified that the police were called, and the defendant was not allowed on the hotel premises after this incident.
 

 Thomas Register, Ms. Parker’s boss, testified that on May 2, he and other coworkers met at the bar after they left work, sometime after midnight. Ms. Parker did not accompany them but she arrived sometime later and sat at the bar with Mr. Davis and other coworkers eating and drinking. Mr. Register saw the defendant come into the bar and shoot at Ms. Parker. He first ducked down, and then followed the defendant as he fled, calling 911 while he did so. He eventually lost the defendant and returned to the bar. Both Ms. Parker and Mr. Davis had been transported from the bar by the time he returned. He gave the police a statement and viewed a photographic lineup from which he chose the defendant’s photograph as that of the shooter. On cross-examination, Mr. Register testified that the shooting occurred just before 5:00 a.m. While viewing surveillance footage from |4the shooting, Mr. Register pointed out the defendant looking in through the windows of the bar prior to entering and shooting.
 

 Brian Davis also worked with Ms. Parker. He and other workers arrived at the bar between 1:00 and 2:00 a.m., and Ms. Parker arrived somewhat later. Ms. Parker indicated that she was going home with a female coworker who was present. He sat next to Ms. Parker at the bar and at one point closed his eyes and put his head down. He heard gunshots and screams and saw Ms. Parker fall to the floor. Then he was shot. He stated that he still had the bullets in his body. While at the hospital he learned of Ms. Parker’s death from her wounds. Mr. Davis gave a statement to the police, and viewed a photographic lineup from which he chose the defendant’s picture as that of the shooter. Mr. Davis denied that he and Ms. Parker were involved romantically; instead, he asserted that Ms. Parker “watched out” for him.
 

 With respect to the May 2 shooting, Ms. Kelsey Herman testified that she arrived at the bar approximately an hour before Ms. Parker did. Ms. Herman was also seated at the bar but around the corner from Ms. Parker and Mr. Davis. Ms. Herman went to speak with someone else in the bar, and as she returned, she heard several gunshots and saw Ms. Parker lying face-down on the floor. She saw the side of the shooter’s face as he fled the bar, and she identified him as the defendant. She had met the defendant a few times in the past when he had picked up Ms. Parker
 
 *59
 
 from the bar, and he had once given her a ride home. She chose the defendant’s photograph from a lineup. She testified that Ms. Parker had planned to spend the night with her on the night of the shooting.
 

 Regarding the May 2 shooting, Mr. Jamie Burton testified that Ms. Parker arrived at the bar escorted by security personnel from the hotel. He was standing |sat the bar, talking with other people, when he heard a noise and saw a man leaving the bar. Mr. Burton saw Ms. Parker back away from the bar and fall to the ground. He did not see the face of the man who left, but from behind the man looked like the defendant, whom he had seen many times in the past when the defendant picked up Ms. Parker.
 

 Officer Reginald Rowe responded to the 911 call concerning the April 28 incident at the bar. Off. Rowe met with Ms. Parker, who told him that the defendant came to pick her up and became enraged when she told him that she needed to pay her bill before leaving. Ms. Parker told him that the defendant pulled the stool out from under her and dragged her out into the street. Off. Rowe spoke with the defendant at the police station, where he admitted that he had pulled the chair out from under Ms. Parker because she was taking too long to leave the bar. The defendant also told him that it was normal for him to pick up Ms. Parker and take her home. Off. Rowe was also working on the night of the shooting, and when he responded to the shooting, he recognized Ms. Parker from the earlier incident. He informed Det. Robert Long, the lead investigator, about the earlier incident.
 

 Detective Robert Long was lead investigator of the shootings. He testified that officers found a gun on the sidewalk just up the street from the bar, and a hat at the corner of Conti and Dauphine Streets. Det. Long met with Mr. Davis at the hospital, and Mr. Davis immediately told him that Ms. Parker’s husband was the shooter. Det. Long identified various photographs taken of the scene and the evidence seized both inside and outside of the bar. He took statements from those inside the bar who witnessed the shooting, and after learning from several witnesses that the defendant was the perpetrator, he obtained an arrest warrant for Rthe defendant. The defendant turned himself in on the evening of the shooting. Det. Long also identified clothing of both victims that he seized from the hospital. The hat that was seized a block from the bar had the words “Barbershop Roy” engraved on the back. The defendant was a barber by trade, and witnesses described the defendant as wearing the hat that night.
 

 Det. Long testified that after the defendant surrendered, he was advised of his rights and taken to the Homicide Office, where he gave a statement. When the statement concluded, Det. Long arrested the defendant. He also had various witnesses view photographic lineups.
 

 On cross-examination, Det. Long stated that when the defendant surrendered, four pairs of women’s underwear were in his pocket. Det. Long referred to the defendant’s statement, wherein the defendant alleged that the underwear had semen on them that he insisted was not his, thereby showing that Ms. Parker was cheating on him. The defendant told Det. Long that he took the underwear to the bar to confront her with them. The defendant told him that he and his wife had not had sex for at least two to three weeks; that they had been together for six years; and, that they had been married for two years, and had two children. The defendant admitted that they had been having problems because Ms. Parker worked late and did not come home immediately afterwards.
 

 
 *60
 
 The gun found up the street from the bar was ultimately determined to be the murder weapon. The defendant told Det. Long that he was upset because he did not to know where his children were and that he had gone to the bar that night to try to reconcile with Ms. Parker. He got angry when he saw her sitting in the bar with other people. The defendant insisted that his body went numb and an evil spirit took over him when he shot Ms. Parker.
 

 17Off. Latoya Hamilton transported the defendant from the Seventh District police station, where he had surrendered, to the Homicide Office. During the journey, he showed her four pairs of women’s underwear, told her that they belonged to his wife, and that the substance in the underwear was not his because they had not had sex in a week.
 

 The defendant’s video statement was played for the jury. He indicated therein that he believed his wife had been cheating on him for a long time, alleging that she had been consorting with owners of strip clubs in Atlanta and with men in New Orleans. He stated that he did not approve of her working nights and then spending time with coworkers at a bar instead of coming straight home. He alleged that his young daughter had told him that terrible things had happened to her while she was staying with other people when his wife was at work. He said he told his wife that she needed to get a nine-to-five job and come straight home to take care of the children. Although he maintained that he was a “stay-at-home” father, he indicated later in his statement that he worked as a barber.
 

 The defendant stated that he had just been released from jail in connection with the “first lil [sic] argument ... altercation,” presumably the April 28 incident. Neither his wife nor their children were at home when he got there. When he asked his wife’s family where the children were, they told him that they did not know. He admitted knowing his wife had moved the children from the house when she learned that he had been released. He alleged that his young daughter told him that she had been harmed while staying with other people. He stated that he went to sleep, awakening around 8:30 a.m.; admitted being aware of the protective order that his wife had obtained against him, but he considered it to be like a divorce the court imposed which neither he nor his wife wanted; and, he wanted his wife to | ¿return to their home. He started going through his wife’s possessions, and he noticed a pair of her underwear lying on the floor. He picked them up and noticed a substance on the underwear. He asserted that they had not had sex for two to three weeks, and he believed that the substance showed that she had had sex with some other man. He went through the rest of her clothing and found other underwear with what he thought was a substance on them. He stuffed them in his pocket and admitted grabbing his gun “just in ... I don’t know what made me grab the gun. I know I shoulda [sic] never done it.... But something just told me to take it.”
 

 The defendant testified that he went to visit his aunt, who had hidden the keys to his car because his driver’s license had been suspended, and told her that he needed the keys to drive to the store. His aunt refused to give him the keys and insisted upon driving him to the store. Instead, he grabbed the keys from her, and she got into the back seat of the car. The defendant drove to the French Quarter to confront his wife and to try to reconcile with her. He parked the car, left the keys with his aunt and walked to the bar. He saw his wife sitting there having fun with her coworkers, and then he did not know what came over him. He described himself as
 
 *61
 
 being “numb,” and he began shooting at her. He wished he had remained on the scene afterward to “comfort” her instead of running away. He began running to clear his head, and he found a place to hide for a while. He paid someone to drive him to his cousin’s house in New Orleans East but his cousin was not home. When the cousin returned, he told defendant he could not stay there and convinced defendant to surrender. His cousin drove him to the police station.
 

 The defendant repeated that he went to the bar only to try to reconcile with his wife and bring her home. He reiterated that she left the house with the children |flfor months, and he was too weak to be patient with what he called her “flaws.” He stated that something came over him while he was standing outside the bar: “Like a [sic] evil spirit my whole body went numb. It was like I didn’t even do it. I swear it was like it wasn’t even me that was doing it.” He stated that he and his wife had been married for over two years, had been together for over six years, and he considered her to be his best friend. He stated that he was prepared to deal with the consequences of the shooting, but: “Thing got out of hand but it ... it wasn’t my fault, like I say ... I believe I was provoked” by many things, including what he termed her “playing with” his head, smiling with men, and coming home late. He had warned his wife that her job and her hanging out in the bar with her coworkers after work would ruin their marriage.
 

 When the officers asked the defendant why he had grabbed the gun before leaving the house, he replied that he did not think that she would be at the bar, imagining that she would have the “sense” to be home with their children. He reiterated that he did not know why he grabbed the gun, noting that he usually did not carry the gun because he got stopped a lot by the police. He admitted that he could not stay away from his wife and described his actions as if he “was on a mission.”
 

 After this case was submitted for decision, Mr. Parker requested, and was granted, permission to file a pro se supplemental brief. We will discuss his pro se assignments of error following consideration of his counseled ones.
 

 DISCUSSION
 

 ERRORS PATENT AND (PRO SE) ASSIGNMENT NO. 3:
 

 A
 
 review of the record reveals no patent errors.
 

 110Mr. Parker appears to allege in his pro se assignment No. 3 that his counsel did not object to the denial of his motions for post-verdict judgment of acquittal and for new trial, and he asserts that this failure to object should not estop this court from considering the claims. Citing
 
 State v. Craddock,
 
 307 So.2d 342 (La.1975), he asserts the failure to object to an error discoverable by under La.C.Cr.P. art. 920(2) does not operate as a waiver of the error. Art. 920(2) provides that a court shall consider an error “that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence.” A claim of the sufficiency of the evidence would not fall within art. 920(2) because it calls for an inspection of the evidence. His claims as to both of these motions have no merit.
 

 COUNSELLED ASSIGNMENT OF ERROR I
 

 By his first counseled assignment of error, appellant contends that the trial court erred by denying him the right to a full voir dire. Specifically, he cites to an instance during voir dire where the court sustained the State’s objections to two questions defense counsel posed to the prospective jurors concerning whether the
 
 *62
 
 jurors automatically would consider a shooting to be murder. This claim has no merit because, the court had already allowed defense counsel to question the jury on basically the same issue without objection by the State.
 

 The Supreme Court set forth the standard for the review of a claim that voir dire was unlawfully limited:
 

 La. Const, art. I, § 17 guarantees a defendant full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges.
 
 State v. Hall,
 
 616 So.2d 664, 668 (La.1993). Nonetheless, the scope of examination rests within the sound discretion of the trial court, and its ruling will not be disturbed absent clear abuse. La.Code Crim. Proc. art. 786;
 
 Hall,
 
 616 So.2d at 669. In determining whether the trial court afforded a sufficiently wide latitude to the defendant, the entire voir dire examination must be considered.
 
 Id.
 

 State v. Holmes,
 
 2006-2988, p. 55 (La.12/2/08), 5 So.3d 42, 79-80, Cert. den.,
 
 Holmes v. Louisiana,
 
 — U.S. —, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). See also
 
 State v. Anear,
 
 508 So.2d 943 (La.App. 4 Cir.1987), where this court also stated that a trial court may not curtail the defendant’s right to ask non-repetitious voir dire questions that “reasonably explore the juror’s potential prejudices, predispositions or misunderstandings relevant to the central issues of the particular case.” This court also noted that a court may limit voir dire “as long as the limitation is not so restrictive as to deprive defense counsel of a reasonable opportunity to probe to determine a basis for challenge for cause and for the intelligent exercise of peremptory challenges.”
 
 Id.
 
 In
 
 Holmes,
 
 the Court found that the trial court did not unduly limit defense counsel’s voir dire concerning fetal alcohol syndrome because counsel was allowed to question the prospective jurors concerning their ability to consider the syndrome as a mitigating factor. Likewise, in
 
 Anear,
 
 this court found that the trial court had not unduly limited voir dire, rejecting the defendant’s claims that he was not allowed to rehabilitate a prospective juror and that he was not allowed to delve into personal information concerning the prospective jurors, information that the State also did not have. By contrast, in
 
 State v. Searles,
 
 94-0190 (La.App. 4 Cir. 12/15/94), 647 So.2d 1329, this court reversed the defendant’s conviction when it found that the trial court had erred by refusing to allow defense counsel to question prospective jurors to determine the | ^accuracy of personal information contained on the jury sheets and by “grudgingly” allowing counsel to ask any questions at all.
 

 Here, appellant points to one instance during voir dire where he contends the trial court improperly limited his examination of the prospective jurors. During the second round of voir dire, defense counsel noted that by that time, the jurors must be hungry. The following then occurred:
 

 DEFENSE COUNSEL
 

 But before we all eat, as you have heard, the State has the burden to prove this case beyond a reasonable doubt. And we need to know that you all are able to consider that the shooting that you’re going to hear about is manslaughter and not murder. If we could go just person by person and just say, I can consider that,’ then we can get out of here and have lunch. If you can’t, if you think shooting some
 
 *63
 
 one is always murder, then you need to say that too.
 

 ASSISTANT DISTRICT ATTORNEY
 

 Objection, Your Honor. I don’t think they can consider it until they have heard some evidence.
 

 BY THE COURT:
 

 Sustained.
 

 BY DEFENSE COUNSEL
 

 I’m sorry. Let me rephrase the question. You need to be able to be open to the possibility that hearing about a shooting is not a murder, that not all shootings are murder. You need to be able to consider manslaughter in your deliberations.
 

 BY ASSISTANT DISTRICT ATTORNEY
 

 Same objection, Your Honor.
 

 BY THE COURT:
 

 Sustained.
 

 |1SBY DEFENSE COUNSEL
 

 Simply note our objection for the record.
 

 Appellant argues that the effect of the court’s sustaining these two objections unduly impinged on his ability to determine if the prospective jurors could consider that a shooting might be manslaughter, not murder. In support, he cites
 
 State v. Shepard,
 
 468 So.2d 594 (La.App. 2 Cir. 1985), but that case is distinguishable because in
 
 Shepard,
 
 the court refused to allow the defense to pose any questions to the prospective jurors about the possibility that the killing was manslaughter, not murder.
 

 However, here a review of the transcript of the entire voir dire shows that both defense counsel and the prosecutor discussed the elements of manslaughter. During the voir dire of the first panel, the prosecutor discussed manslaughter and gave hypothetical examples to explain provocation. During her questioning of the same panel, defense counsel continued the example given by the prosecutor and asked what would happen if the victim pulled a gun on the shooter. A prospective juror replied that the shooter would be provoked. Defense counsel then asked if the situation would change if the gun that the victim brandished was a squirt gun, and the juror replied that it would depend. Defense counsel then stated: “A lot of facts could be placed into that scenario, right? You have to look at the whole scenario, not just the actions of the person who’s pulling out the gun and firing. Is that fair,” to which the juror replied: “Yes.”
 

 Later, during voir dire of the same panel, defense counsel spoke about circumstances building and building, “there’s a moment with the straw that breaks the camel’s back, and someone is accused of killing somebody else, and the circumstances show that there was that kind of building until it all fell apart, does | uthat sound like a manslaughter to you, based on the definition you’ve heard?” A juror replied: “Generally, yes. I would have to know what the facts are.” Defense counsel agreed, noting: “Because without the rest of the facts, it would just be the shooting of a gun to the chest, right?” Later, during the second round of voir dire, defense counsel asked, “How many people here think that if you kill another person, that it’s always murder? ... Everyone understands that there are circumstances when you kill another person and it’s not for whatever reason, murder.”
 

 A full reading of the voir dire transcript shows that although the trial court sustained the State’s objections, defense counsel was able to question the prospective jurors earlier concerning their ability to consider the shooting to be a manslaughter. Indeed, the basis of the State’s
 
 *64
 
 objections was that the jury could not commit to finding the appellant guilty of manslaughter until it had heard the evidence. As noted in
 
 Holmes:
 

 Louisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical scenario which would demand a commitment or pre-judgment from the juror or which would pry into the juror’s opinions about issues to be resolved in the case. “It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial.”
 
 State v. Williams,
 
 230 La. 1059, 89 So.2d 898, 905 (1956).
 
 See also State v. Vaughn,
 
 431 So.2d 358, 360 (La.1983);
 
 State v. Square,
 
 257 La. 743, 244 So.2d 200, 226 (1971) (“Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence offered to be offered at trial”), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (1972);
 
 State v. Smith,
 
 216 La. 1041, 45 So.2d 617 (1950) (hypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts).
 

 |
 
 isHolmes,
 
 at p. 56, 5 So.3d at 80.
 

 Contrary to the appellant’s argument, we find the trial court did not unduly limit his counsel’s voir dire of the prospective jurors on the issue of manslaughter. This assignment of error has no merit.
 

 COUNSELLED ASSIGNMENT OF ERROR II.
 

 In his next counseled assignment of error, appellant contends that the trial court erred by denying his proposed jury instruction concerning adultery and manslaughter. His proposed jury instruction stated: “In Louisiana, adultery has been found to constitute sufficiently adequate provocation to support a conviction for manslaughter. You may find Mr. Parker’s belief that Veronica Parker was committing adultery to be sufficient provocation.” The court refused to read this instruction to the jury, “given the fact that there’s been no facts that relate to that manslaughter instruction that you’ve provided to the Court.” The appellant now argues that the trial court erred because “evidence” of his wife’s adultery was presented in his statement, which the State presented to the jury. The appellant asserts that the court erred by finding that the defense had to provide evidence that the victim was actually committing adultery, rather than mere evidence to show that he
 
 believed
 
 she was committing adultery, in order to read the proffered instruction. This claim also has no merit.
 

 A trial court must instruct the jury as to the law applicable to responsive verdicts. La.C.Cr.P. art. 803. La.C.Cr.P. art. 802 mandates that the trial court instruct the jury as to the law applicable to each case. This rule has been interpreted as requiring the trial court to charge the jury, when properly requested, 11fias to the law applicable to any theory of defense which the jurors could reasonably infer from the evidence. See La.C.Cr.P. art. 807, which provides in part that requested special written charge shall be given “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.” See also
 
 State v. Goodley,
 
 2001-0077 (La.6/21/02), 820 So.2d 478;
 
 State v. Jackson,
 
 450 So.2d 621, 632 (La. 1984);
 
 State v. Scott,
 
 2009-0138 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, writ den., 2009-2773 (La.6/18/10), 38 So.3d 320;
 
 State v. Patterson,
 
 99-994 (La.App. 5 Cir.
 
 *65
 
 1/25/00), 752 So.2d 280. As noted by this court in
 
 State v. Jenkins,
 
 98-1608, pp. 23-24 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, 379: “The refusal to give a requested special charge does not warrant reversal of a defendant’s conviction unless it prejudices substantial rights of the accused. La. C.Cr.P. article. 921;
 
 State v. Marse,
 
 365 So.2d 1319 (La.1978);
 
 State v. Johnson,
 
 514 So.2d 684 (La.App. 2d Cir.1987).”
 

 In
 
 Goodley,
 
 a murder case, the Court found that the trial court did not err in failing to instruct the jury on theft, with respect to the responsive verdict of manslaughter, where the evidence showed that the defendant was a principal to the underlying armed robbery. In
 
 Jackson,
 
 the Court held that in a first degree murder prosecution the trial court did not err in refusing to give the defendant’s requested instruction concerning negligent homicide because that offense was not fairly supported by the evidence, in that the defendant strangled the victim. In
 
 Scott,
 
 this court found that the trial court properly denied the motion to instruct the jury on the defense of others, where there was no indication that the victim was threatening anyone. In
 
 Patterson,
 
 the court found no error in the trial court’s refusal, in a second degree murder prosecution, to give a requested charge on negligent homicide, where there was no evidence from which the jury could have inferred 117guilt of that lesser offense. The victim died in the hospital after he was severely beaten by the defendant outside of a bar.
 

 In support of his argument that the court should have given his proposed instruction, appellant cites
 
 State v. Cancienne,
 
 50 LaAnn. 847, 24 So. 134 (1898), where the Court stated that manslaughter occurs when a defendant learns of his wife’s infidelity and kills his wife or her lover. He points to the fact that his statement, introduced at trial, showed that he
 
 believed
 
 that his wife was having an affair, thereby giving him the requisite provocation to reduce the shooting to a manslaughter, not a murder. He maintains that the court should have given his proposed instruction that equated the knowledge of adultery with sufficient provocation to render his actions a manslaughter.
 

 Appellant acknowledges that
 
 Cancienne
 
 has been limited by later cases. In
 
 State v. Massey,
 
 535 So.2d 1135 (La.App. 2 Cir. 1988), the court refused to apply
 
 Cancienne
 
 where the defendant caught his wife in the act of adultery over five months before he eventually killed her. The court held that any provocation that the adultery may have caused him was too remote in time to transform his stabbing of her into a manslaughter, even when she taunted him with the affair just prior to the stabbing. Likewise, in
 
 State v. Jack,
 
 596 So.2d 323 (La.App. 3 Cir.1992), the defendant killed his gay lover. The court rejected the defendant’s claim that his discovery of his lover’s infidelity caused sufficient provocation under
 
 Cancienne
 
 to reduce his killing to manslaughter, in that the defendant and the victim were not married, and thus the victim’s conduct was not adultery as defined in Louisiana.
 

 We find
 
 Cancienne
 
 distinguishable from the present case because Cancienne found his wife and her lover about to consummate the act. Here, there was no evidence of any actual adultery by the victim; at best, the appellant’s statement 11Ronly showed that he
 
 believed
 
 that she had had sexual relations
 
 at some point
 
 before he found her underwear. Appellant has presented no jurisprudence to support his contention that a
 
 belief
 
 of adultery is sufficient to reduce a murder to a. manslaughter. The State cites several cases from other jurisdictions that limit voluntary manslaughter to cases where the defendant finds his spouse in the act of adultery
 
 *66
 
 or immediately before or after an act of adultery, and the defendant immediately kills his spouse. See
 
 People v. Chevalier,
 
 131 Ill.2d 66, 136 Ill.Dec. 167, 544 N.E.2d 942 (Ill.1989);
 
 Commonwealth v. Bermudez,
 
 370 Mass. 438, 348 N.E.2d 802 (Mass. 1976). In
 
 Shields v. State,
 
 285 Ga. 372, 677 S.E.2d 100 (Ga.2009), the court found that counsel was not ineffective for failing to request the court to instruct the jury that a killing made after the discovery of adultery was a manslaughter because the defendant knew of his wife’s affair with another man for a long time before he shot her during an argument. The court also noted that the trial court’s instruction on voluntary manslaughter would have allowed the jury to find the defendant guilty of that offense had it chosen to do so. The thread running through these cases is that finding a spouse in the act of adultery and immediately killing the spouse or the spouse’s lover is essential to a finding of voluntary manslaughter.
 

 Here, at best, appellant argues that his statement showed that he believed that his wife was having an affair because he found her underwear with an unknown substance in them, and he had not had sexual relations with her for two or three weeks. He argues that this discovery, added to his seeing her sitting in the bar with a coworker, gave him a sufficient basis to believe that she was committing adultery, and thus the court erred by refusing to give his proposed instruction.
 

 11flThe facts of the case just do not support a showing that his killing of his wife and his shooting of her co-worker were spontaneous acts as he alleges. There was no showing that he shot his wife “immediately” after he “discovered evidence” of her “adultery.” Appellant attacked his wife in the same bar a few days before the shooting; thus, his “discovery” of her underwear, allegedly containing an unknown substance, was not the circumstance that triggered the shooting. In addition, appellant admitted that he armed himself and intended to go to the bar, where he knew the victim and her coworkers gathered after work, before he found the underwear. He had picked the victim up from the bar after work many times and just prior to the shooting, he merely saw his wife sitting with the other shooting victim and other co-workers at the bar. These facts do not evidence a rational belief that his wife was committing adultery.
 

 Although the record does not contain the entire jury instructions, it is clear that the court included a definition of manslaughter in its instructions because after the jurors had deliberated for a time, they returned and asked the court to define “sudden” as used in its definition of manslaughter. The court then reread the definition of manslaughter. Thus, the jury was aware that it could have returned a manslaughter verdict; it apparently found that appellant’s alleged belief that his wife was having an affair was not rational. Appellant failed to show that the jury could have reasonably accepted his theory that he rationally believed that his wife was committing adultery, and thus, he failed to show that the trial court erred by refusing to give his proposed jury instruction. This assignment has no merit.
 

 \mPRO SE ASSIGNMENT ONE
 

 By his first pro se assignment, appellant contends that the evidence was insufficient to support his convictions for the second degree murder of his wife and the attempted second degree murder of her coworker. He argues that the State failed to show that he had the specific intent to kill or inflict great bodily harm on the victims. He insists that the evidence showed, and the State failed to negate, that he acted in sudden passion or heat of blood, and thus
 
 *67
 
 he should have been convicted of only manslaughter and attempted manslaughter. He maintains that the court erroneously instructed the jury on the element of “sudden,” and had the court properly instructed the jury, it would have returned the responsive verdicts.
 

 As we noted earlier the record does not include the transcript of the entire jury instructions, but we have concluded the court instructed the jury on manslaughter because after deliberations began the jury asked it to define “sudden” with respect to manslaughter. The court reread the manslaughter statute. There was no objection to the instruction given by the court; the only objection was with respect to the court’s refusal to give the manslaughter instruction as discussed in the second counseled assignment of error. Thus, any error with respect to the charge is not preserved for appeal. See La.C.Cr.P. art. 841;
 
 State v. Parker,
 
 2008-1473 (La.App. 4 Cir. 4/29/09), 11 So.3d 534. As noted by this court in
 
 State v. Taylor,
 
 91-2496, p. 5 (La.App. 4 Cir. 3/29/94), 635 So.2d 416, 420: “The contemporaneous objection rule exists, not only so that a trial judge may correct the error at the time it is made, but it also serves notice in the record that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors.”
 

 |21In any event, we find there was sufficient evidence for the jury to reject Mr. Parker’s claim that he shot his wife and her coworker in sudden passion or heat of blood. La. R.S. 14:31 defines manslaughter in pertinent part as:
 

 (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
 

 In addition, the statute provides: “Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed ...” See also
 
 State v. Collor,
 
 99-0175 (La.App. 4 Cir. 4/26/00), 762 So.2d 96. “Sudden passion” and “heat of blood” are not separate elements of the offense but are mitigating factors, which the defendant must establish by a preponderance of the evidence.
 
 State v. Batiste,
 
 2006-0875 (La. App. 4 Cir. 12/20/06), 947 So.2d 810;
 
 State v. McClain,
 
 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590. As noted by this court in
 
 Collor:
 

 Thus, in reviewing defendant’s claim that the evidence supports a manslaughter verdict, this Court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence.
 
 State v. Sanders,
 
 93-0001, p. 18-19 (La.11/30/94), 648 So.2d 1272, 1287,
 
 cert. denied
 
 517 U.S. 1246, 116 S.Ct. 2504,135 L.Ed.2d 194 (1996).
 

 State v. Collor,
 
 at p. 11, 762 So.2d at 103.
 

 laAlso, La. R.S. 14:27A provides: “Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.”
 

 
 *68
 
 Appellant cites
 
 State v. Lombard,
 
 486 So.2d 106 (La.1986), where the Court found that the evidence presented at trial was sufficient to support only a conviction of manslaughter, not the second degree murder verdict that the jury returned. The defendant and the' victim got into an argument at a football game over something that the defendant said to the victim’s girlfriend. The argument escalated into a physical fight that resulted in the defendant stabbing the victim. There, the Court found that the evidence showed that the stabbing occurred in sudden passion or heat of blood, and it vacated the jury’s verdict and imposed a verdict of manslaughter.
 

 We find
 
 Lombard
 
 is distinguishable. Here, appellant insisted in his statement to the police and now argues that he merely intended to meet with his wife and convince her to come home to him, even though he found what he insisted was evidence of her adultery in her underwear. He avers that when he saw his wife with her coworkers, he became numb, and it was like something took over his body and he was on a mission. He argues that this showed that he shot the victims in a sudden passion or in heat of blood, thereby lessening the shootings to a manslaughter and an attempted manslaughter. However, this “evidence” was negated by the fact that he grabbed his gun before leaving his house, tried to trick his aunt into believing that he wanted his car keys only to go to the store, and then drove to the French Quarter, armed, to meet with her. Given these factors, the jury | Mcould very well have rejected his claim that the shootings were merely the result of his heat of blood or sudden passion caused by seeing her sitting with her coworkers. Instead, the jury could have believed that he left his house with the intention of shooting his wife to death, and in doing so he also shot her coworker. We find the evidence was sufficient for the jury to find him guilty beyond a reasonable doubt of second degree murder and attempted second degree murder. This assignment has no merit.
 

 PRO SE ASSIGNMENT TWO
 

 By his second
 
 pro se
 
 assignment, appellant contends that the trial court erred by denying his motions for new trial and for post-verdict judgment of acquittal. With respect to the motion for acquittal, as discussed in his first pro se assignment, the evidence was sufficient to support his convictions. In the motion for new trial, appellant alleged that the verdict was contrary to the law and evidence; that the court erred by dismissing a juror after he had been sworn and the trial began; and that the court erred by denying counsel’s motion to withdraw after counsel became aware that he had friends who were well acquainted with the victim and the eyewitnesses. Appellant makes no argument as to the second and third grounds, basing his assignment on the first ground and arguing that the court should have granted a new trial in the interests of justice.
 

 Jurisprudence long held that an assignment of error contending that a trial court erred by denying a motion for new trial based on a claim that the verdict was contrary to the law and evidence under La.C.Cr.P. art. 851(1) presented nothing for appellate review. See
 
 State v. Gray,
 
 351 So.2d 448 (La.1977);
 
 State v. Bartley,
 
 329 So.2d 431 (La.1976). In
 
 State v. Guillory,
 
 2010-1231 (La.10/8/10), 45 So.3d |
 
 m612,
 
 the Court held that the denial or granting of a motion for new trial based on art. 851 (5), where the ends of justice will be served with a new trial even though the defendant is not entitled to one “as a matter of strict legal right,” presents a question of law that is to be reviewed under an abuse of discretion standard. In
 
 State v.
 
 
 *69
 

 Collins,
 
 2010-1181 (La.App. 4 Cir. 3/23/11), 62 So.3d 268, this court questioned whether the Court’s holding in
 
 Guillory
 
 should also be applied to a motion for new trial based on a claim that the verdict is contrary to the law and evidence. Here, however, even if the claim is subject to review, the trial court did not err by denying the motion on this basis because the verdict was supported by the law and evidence. The cases cited by the appellant,
 
 State v. Johnson,
 
 98-2022 (La.12/18/98), 731 So.2d 273, and
 
 State v. Davis,
 
 01-1275 (La.App. 5 Cir. 4/10/02), 817 So.2d 171, do not require a different finding. In
 
 Johnson,
 
 the Court found that this court’s ruling vacating the trial court’s grant of a new trial under art. 851(1) was an error because the court actually had granted a motion for post-verdict judgment of acquittal. The Court reversed the granting of the acquittal, vacated this court’s ruling, and remanded the case for the trial court to rule on the motion for new trial. In
 
 Davis,
 
 the court vacated the defendant’s sentence and remanded the case for the trial court’s ruling on his motion for post-verdict judgment of acquittal.
 

 Appellant appears to argue that the trial court erred by denying his motions without affording him a hearing. However, the trial court was aware of the evidence presented at trial, and the motions did not specify how the evidence did not support the jury’s verdicts. This assignment has no merit.
 

 \ ^CONCLUSION
 

 None of the appellant’s counseled or pro se assignments of error have merit. Accordingly, we affirm his convictions and sentences.
 

 AFFIRMED.