JAMES F. McKAY, III, Chief Judge.
hThe defendant, Joseph Perkins, appeals from his conviction and sentence for violating La. R.S. 14:95.1, to wit, possession of a firearm or carrying a concealed weapon by a person convicted of certain felonies. For the reasons that follow we find that the trial court erred in denying Joseph Perkin’s request for special jury instructions concerning self-defense/justification. Thus, we reverse the defendant’s conviction, vacate his sentence and remand *914 the matter to the trial court for further proceedings consistent with this opinion.
PROCEDURAL HISTORY OF CASE
The State filed the bill of information in this matter on June 10, 2010. The defendant, Joseph Perkins, was charged with one count of violating La. R.S. 14:95.1, which prohibits a convicted felon from possessing a firearm or a concealed weapon. The defendant entered a not guilty plea at his arraignment on June 16, 2010. At the arraignment, the State turned over a copy of the police report to defense counsel. A motion hearing was held on September 30, 2010; the court found probable cause to substantiate the charge and denied the motion to suppress evidence. After several defense continuances, so that forensic testing could be completed, the trial commenced on November 15, 2011. It concluded on [¡.November 16, 2011 when the twelve-person jury returned a verdict of guilty. On December 15, 2011, the defense counsel filed a motion in arrest of judgment with an accompanying memorandum; the trial court denied the motion on January 5, 2012. The defense objected and gave notice of intent to seek writs. After this Court denied the defendant’s writ application and the request for a stay order,[1] the defendant appeared for sentencing on January 23, 2012. Defense counsel first filed a motion for new trial, which the court denied. The defense Counsel then announced that his client was ready for sentencing. The trial court imposed a sentence of fifteen years at hard labor. Pursuant to a plea bargain involving two other pending cases against the defendant, the State agreed not to file a multiple bill in this case.
STATEMENT OF THE FACTS
Deputy Lance Wade, a deputy employed by the Orleans Parish Sheriffs Office and assigned to the Special Operations Division, testified that on April 28, 2010, he responded to an incident at New Orleans Parish Prison (“O.P.P.”) to conduct an investigation of an altercation between inmates. As part of his investigation, Deputy Wade attempted to interview the defendant in the O.P.P. medical clinic where the defendant was receiving treatment for lacerations to his head, arms, chest, and neck. The defendant declined to be interviewed. Another inmate, Desmond Douglas, was also in the medical clinic being treated for numerous lacerations; he too declined to give a statement to Deputy Wade. Deputy Wade took photographs of the injuries suffered by the defendant and ¡¡¡Desmond Douglas.[2] He also photographed four homemade knives, or shanks, which had been seized by other deputies.
Sergeant Chaz Ruiz of the Orleans Parish Sheriffs Office, a watch commander at O.P.P., testified that on April 28, 2010, he was advised that an incident had just occurred on tier A-3. When Sergeant Ruiz reached the tier, he saw two inmates, Desmond Douglas and Alvin Ivery, being led off the tier and placed against a wall by deputies. Seconds later, the defendant was called out of the tier by Deputy Darren Vicknair and placed against the wall to be searched. Sergeant Ruiz then began searching the defendant, starting from the collar area. As he searched, the defendant took two shanks out of his pants and threw them on the floor; he then placed his *915 hands back onto the wall. Sergeant Ruiz finished searching the defendant, but found no contraband. He also searched Alvin Ivery, with negative results. As the sergeant turned his attention to Desmond Douglas, Douglas reached into his clothing and threw two shanks onto the floor. The subsequent search of Desmond Douglas was negative.
During cross-examination, Sergeant Ruiz stated that the defendant put his hands into his waistband, and then discarded the shanks.
On April 28, 2010, Deputy Darren Vick-nair was working as the floor deputy on the night shift on tier A-3 at O.P.P. At approximately 5:00 a.m. the inmates’ breakfast was delivered to the two day rooms on the tier, and the inmates were released from their cells to go to the day rooms to eat. As Deputy Vicknair was watching the two day rooms and the hallway from a central point, he observed 14Alvin Ivery and Desmond Douglas in the left-side day room. The two inmates were standing across from each other. Alvin Ivery had his hands behind his back, and in each hand was a knife or shank. Desmond Douglas had his hands in his pants. Deputy Vicknair immediately called for backup, and in response the watch commanders from the previous night shift as well as the morning watch commanders responded. Once Deputy Vicknair had sufficient support, he opened the third door leading to the tier and instructed Alvin Ivery and Desmond Douglas to walk out, which they did. However, before Alvin Ivery walked out of the day room, he sat back onto a table and placed the two knives down. Deputy Vicknair then saw the defendant walk up, pick up the two knives, and place them in the front of his pants where they could not be seen. The defendant then tried to walk away, but was called off of the tier by the deputy. Once outside of the day room and against the wall, the defendant threw the knives to the floor as he was being searched.
Deputy Vicknair testified that he did not observe the defendant in any type of altercation. He also denied observing a fight between Alvin Ivery and Desmond Douglas.
The State also called as a witness Officer George Jackson, an expert in the field of fingerprint analysis, who testified that he compared a set of the defendant’s fingerprints, which he obtained on the day of the trial, to two fingerprints on the back of a bill of information. In his expert opinion, the fingerprints on the back of the bill of information were those of the defendant. Officer Jackson testified further that the front of the bill of information reflected that the name of the person charged in the bill with the robbery of Linda Hughes was Joseph Perkins. The bill of information was in a court file which included a guilty plea form reflecting that |Bthe defendant was sentenced to eighteen months. The case number for the court file was 410-727. From these documents and the fingerprints, Officer Jackson was able to state that the defendant was the same Joseph Perkins who pled guilty to robbery in case number 410-727, which is the predicate offense used to establish the defendant’s felony offender status.
The defendant’s first witness at trial was Deputy Wade, who was asked about his interview with Deputy Vicknair during his investigation into the incident. When asked if Deputy Vicknair told him that the defendant and Desmond Douglas were involved in a “frantic physical confrontation,” he stated that, if this was in his report, then it was what Deputy Vicknair told him. Deputy Wade admitted that he recalled Deputy Vicknair reporting that he saw a physical confrontation between Desmond Douglas and the defendant, but he could *916 not recall the exact words which the deputy used to describe the incident. After reviewing his report of his investigation to refresh his recollection, Deputy Wade testified that, during the confrontation between Desmond Douglas and the defendant, Alvin Ivery placed a shank on a bench. On cross-examination, Deputy Wade stated that he recalled Deputy Vick-nair telling him that, although he did not see the altercation, he did observe stab wounds on Desmond Douglas and the defendant.
On the second day of trial, the defense called Jennifer Valentine of the Tarrant County Medical Examiner’s Office and Forensic DNA lab to testify regarding DNA testing she conducted on the four shanks seized after they were thrown down by the defendant and Desmond Douglas.[3] The court, after hearing Rher qualifications, found that Ms. Valentine was an expert in the field of DNA analysis and as such could give opinion testimony. After describing at length DNA testing in general and the methods and steps taken in the office in which she is employed,[4] Ms. Valentine testified regarding the specific tests she ran on the four knives submitted to her in this case. She first tested for evidence of human blood. Testing was positive on the handle of the first knife she tested, which she labeled knife A, and on the last one she tested, knife D. After conducting the blood testing, Ms. Valentine returned the evidence to the clerk’s office. Then, after reporting her findings to defense counsel, the knives were returned to her. At the same time, she received a sealed envelope marked as containing buccal swabs from Joseph Perkins. After conducting DNA testing on knife A and the buccal swabs, Ms. Valentine concluded that the DNA profile obtained from the handle of knife A was the same DNA profile obtained from the defendant’s buccal swab. The DNA profile obtained from the knife established that the blood on the handle was the defendant’s blood. Ms. Valentine was unable to obtain a DNA profile from the other three knives.

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, the appellant maintains that the trial court erred when it refused to give the jury his requested instructions regarding self-defense, necessity, and justification. The proposed instructions were submitted to the trial court, which the trial court rejected on the grounds that there was no 17evidence adduced at trial to support an argument that the defendant possessed the knives due to an emergency or to protect himself or others.
La.C.Cr.P. art. 802(1) provides that the court shall charge the jury “[a]s to the law applicable to the case.” Pursuant to La.C.Cr.P. art. 808, “[w]hen a count in an indictment sets out an offense which *917 includes other offenses of which the accused could be found guilty under the provisions of Article 814 or 815, the court shall charge the jury as to the law applicable to each offense.” La.C.Cr.P. art. 807 provides that
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
Any such charge must be supported by the evidence. State v. Craig, 95-2499, p. 7 (La.5/20/97), 699 So.2d 865, 869. In State v. Parker, 2010-1277 (La.App. 4 Cir. 9/21/11), 76 So.3d 55, writ denied 2011-2339 (La.3/9/12), 84 So.3d 551, this Court discussed these articles and how they had been interpreted in various cases:
A trial court must instruct the jury as to the law applicable to responsive verdicts. La.C.Cr.P. art. 803. La.C.Cr.P. art. 802 mandates that the trial court instruct the jury as to the law applicable to each case. This rule has been interpreted as requiring the trial court to charge the jury, when properly requested, as to the law applicable to any theory of defense which the jurors could reasonably infer from the evidence. See La.C.Cr.P. art. 807, which provides in part that requested special written charge shall be given “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.” See also State v. Goodley, 2001-0077 (La.6/21/02), 820 So.2d 478; State v. Jackson, 450 So.2d 621, 632 (La.1984); State v. Scott, 2009-0138 (La.App. 4 Cir. 11/18/09), 26 So.3d 283, writ den., 2009-2773 (La.6/18/10), 38 So.3d 320; State v. Patterson, 99-994 (La.App. 5 Cir. 1/25/00), 752 So.2d 280. As noted by this court in State v. Jenkins, 98-1603, pp. 23-24 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, 379: “The refusal to give a requested special charge does not warrant reversal of a defendant’s conviction unless it prejudices substantial rights of the accused. La.C.Cr.P. article. 921; State v. Marse, 365 So.2d 1319 (La.1978); State v. Johnson, 514 So.2d 684 (La.App. 2d Cir.1987).”
In Goodley, a murder case, the Court found that the trial court did not err in failing to instruct the jury on theft, with respect to the responsive verdict of manslaughter, where the evidence showed that the defendant was a principal to the underlying armed robbery. In Jackson, the Court held that in a first degree murder prosecution the trial court did not err in refusing to give the defendant’s requested instruction concerning negligent homicide because that offense was not fairly supported by the evidence, in that the defendant strangled the victim. In Scott, this court found that the trial court properly denied the motion to instruct the jury on the defense of others, where there was no indication that the victim was threatening anyone. In Patterson, the court found no error in the trial court’s refusal, in a second degree murder prosecution, to give a requested charge on negligent homicide, where there was no evidence from which the jury could have inferred guilt of that lesser offense. The victim died in the hospital after he was severely beaten by the defendant outside of a bar.
*918 Parker, 2010-1277, pp. 15-17, 76 So.3d at 64-65.
The statutory defense of justification is a codification of the legal doctrine of necessity, which generally provides that the existence of extenuating circumstances will defeat criminal culpability. See State v. Recard, 97-754, pp. 5-7 (La.App. 3 Cir. 11/26/97), 704 So.2d 324, 327-29, and authorities cited therein. As the Third Circuit has pointed out, this doctrine has been applied under circumstances other than those enumerated in La. R.S. 14:18, Recard at 6-7, 704 So.2d at 328, and has been recognized as providing a defense in any case in which it is not expressly prohibited, including a prosecution for violating La. R.S. 14:95.1. State v. Blache, 480 So.2d 304 (La.1985); State v. Smith, 96-2502 (La.App. 4 Cir. 12/27/96), 686 So.2d 1009; State v. Jones, 539 So.2d 866 (La.App. 4 Cir.1989). This is in accord with the language of La. R.S. 14:18, which provides for the general | ^provisions for justification: “The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances: ... (7) When the offender’s conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22.” La. R.S. 14:19, concerning the use of force or violence in defense, provides in pertinent part:
A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.
[[Image here]]
C. A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.
D. No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person or property had a reasonable belief that force or violence was reasonable and apparently necessary to prevent a forcible offense or to prevent the unlawful entry.
In Blache, where the court recognized that a defense of justification is available to a defendant charged with violating La. R.S. 14:95.1, the court explained the parameters of that defense in such a case:
We hold that when a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense, or in defense of others. In such situation justification is a defense to the charge of felon in possession of a firearm.
1 ,„This is not to say that a convicted felon is entitled to own or maintain possession of a weapon, constructive possession or otherwise, for protection, or for any other reason.
Blache, 480 So.2d at 308. See also State v. Sanchell, 2011-1672, p. 7 (La.App. 4 Cir. 10/31/12), 103 So.3d 677, 681.
“ ‘Necessity,’ when raised as a defense to the illegal possession of a firearm, *919 entails proof that the threat of force by another is imminent and apparent, and that the person threatened has no reasonable alternative but to possess the firearm.” State v. Jackson, 452 So.2d 776, 779 (La.App. 4 Cir.1984). [emphasis in original.]
Here the trial court refused to give any of the defendant’s proposed jury instructions regarding self-defense or justification, finding a lack of evidence to make any of the defenses applicable to the facts presented. Defense counsel argued that there was evidence of an altercation, during which the defendant had clearly suffered significant injuries to his head, arms, chest and face area which required him to be brought to the O.P.P. medical clinic where he was given numerous stitches.
The court reviewed all of the potential grounds for a defense of justification under La. R.S. 14:18, and found that that there was a lack of evidence to suggest any applied. The court noted that, while there was evidence of the injuries suffered by the defendant, there was “no testimony as to how those were obtained. There was testimony that he may have been involved in something with Mr. Douglas, but nothing further than that. No one testified as to that.”
Based on our review of the record it is apparent that the wounds to the defendant were clearly visible and evident of defensive wounds. There was blood on both the defendant and Desmond Douglas, but not on Alvin Ivery. | n Furthermore, the DNA testing proved that the defendant’s blood was on one of the knives that he threw down as he was being searched. Clearly, a violent altercation had transpired in which the defendant was involved. What testimony was needed to corroborate that there had been a violent altercation and that the defendant had suffered significant injuries? The prior testimony of Officer Vicknair confirms that he saw Desmond Douglas and Alvin Ivery with knives. He also saw the defendant pick up the knives that Alvin Ivery had placed on the table in the day room. Deputy Vicknair testified that he realized that there was or had been an altercation, when he saw Desmond Douglas and Alvin Ivery facing off in the room. He could see that Alvin Ivery was holding two shanks behind his back. At that point, there apparently was no physical confrontation between Desmond Douglas and the defendant or Desmond Douglas and Alvin Ivery or the defendant and Alvin Ivery. The defense counsel’s attempt to elicit that Deputy Vicknair had witnessed an altercation between Desmond Douglas and the defendant, was to no avail. It begs the question, how or when did the defendant’s injuries occur?
It is improbable that the defendant’s injuries were self-inflicted. Here, hypo-theticals are not needed, nor is testimony from any eye-witness. The injuries which the defendant sustained appear defensive in nature and speak for themselves. The defendant was incarcerated in O.P.P. at the time of the altercation; not in a neighborhood bar, at a work site, or in an office setting. While we note that there are rules in all State prisons forbidding the possession of weapons and contraband by inmates and a significant necessity for the wardens to control their prisons to prevent just such violent altercations, the inevitability of violence in prisons is present. See La. R.S. 14:402(B)(D)(2). In this specific instance the probability that this altercation was over before the duty officers | ^arrived at the scene is highly unlikely. This is evidenced by the fact that Desmond Douglas continued to possess two shanks until the deputies began their search. Only when the deputies appeared and only after Desmond Douglas dropped *920 his shanks to the floor did the defendant dispel the shanks that he possessed. The defendant obviously knew that Desmond Douglas was still armed and that he and Alvin Ivery were still in danger from Desmond Douglas until the deputies’ intervention. The imminent danger was averted. It is reasonable to conclude that the defendant perceived that he was still in imminent danger of death or further bodily harm and that he was continuing to protect himself.
The trial court erred in refusing to give the jury instructions on self-defense and justification, thereby denying the defendant a fair trial by denying the jury the opportunity to consider those potential defenses and the reasonableness of the defendant’s actions. Therefore, based on the facts of this case we reverse the defendant’s conviction and vacate his sentence and remand the matter to the trial court for further proceedings consistent with this opinion.
ASSIGNMENT OF ERROR NUMBER 2
In his second assignment of error, the appellant avers that the bill of information was fatally defective as it failed to properly charge him with an offense. As we have reversed the defendant’s conviction and vacated his sentence any opinion on this assignment of error is moot.
ERRORS PATENT
Although, a review of the record for errors patent reveals two pertaining to the sentencing provisions of La. R.S. 14:95.1, as we have reversed the defendant’s conviction and vacated his sentence, the implementation of the patent error #1, is moot.
| ^CONCLUSION
The defendant’s conviction is reversed, his sentence is vacated and the matter is remanded for further proceeding consistent with this opinion.
REVERSED; SENTENCE VACATED AND REMANDED
LOB RANO, J., dissents with reasons.

. State v. Perkins, unpub. 2012-0063 (La.App. 4 Cir. 1/13/12).

. Desmond Douglas was charged in the bill of information with one count of violating La. R.S. 14:402(B), possession of a shank (homemade knife) in Orleans Parish Prison. Mr. Douglas is not a party to this appeal as he entered a plea of guilty to the charge on August 12, 2010, in exchange for a two-year sentence and no multiple bill.

. The last witness on the first day of trial was David Olasky, an investigator formerly employed by the Orleans Parish Public Defender Program. He set out his actions in connection with having knives sent from the Property and Evidence room to the Tarrant County Forensic DNA lab; this was done on two occasions. He also testified that he obtained buccal swabs from the defendant and described the steps he took to have the swabs sent to the same lab. Each time the evidence was sent to the lab, it was returned directly to the clerk’s custody.

. Ms. Valentine stated that the Tarrant County Forensic DNA lab receives cases primarily from North Texas, but also from throughout the country. The latter typically are defense requests for testing. All agencies except the Tarrant County District Attorney’s Office are charged for DNA analyses. Ms. Valentine is permitted to use personal leave time to testify in these cases and to bill privately for her time.